Ángel S. Sifre, José Dávila Ricci, Luis Rechani Agraít, Enrique Gatell and Joaquín A. Burset, as members of the Insular Racing Commission, Petitioners, *v.* Daniel Pellón, Jr., Acting Judge of the District Court of San Juan, and Manuel C. Rolán, Defendants.

No. 74. Argued March 14, 1939.—Decided April 12, 1939.

*Diego O. Marrero,* for the petitioners; *Celestino Iriarte, F. Fernández Cuyar* and *H. González Blanes,* for defendant Rolán.

MR. JUSTICE DE JESÚS delivered the opinion of the Court.

Manuel C. Rolán filed a petition for injunction in the District Court of San Juan against the Insular Racing Commission in which he substantially alleged:

That he is the owner of a stable of racing horses among which are Joan Crawford, Mae West and Myrna Loy, all of which are recorded with the Insular Racing Commission. That on January 25, 1937, he acquired the above mentioned three horses by purchase from a breeder from Culebra who was duly registered with the Insular Racing Commission, said breeder belonging to the Heirs of Nieves & Castrillón. That when the petitioner acquired said three horses they were already recorded in the books of the Insular Racing Commission as horses borne in this country and they had been inspected, approved and marked as such by the officials of said commission. That the value of said horses is in excess of $5,000 and that three months after having acquired them he was notified by the defendant of a copy of a decision rendered by it by virtue of which he was forbidden to record them to take part in races in the race tracks of Puerto Rico. He was also forbidden to sell, cede or transfer said horses until an investigation had been made, which according to the defendant had begun some time ago, in order to determine the origin of said horses. That he was also notified on May 16, 1938, of another decision of the defendant by which it

suspended payment to the petitioner of the sum of $480 corresponding to the first prize won by the horse Joan Crawford in the races of July 17, 1937, or that is, approximately one year before the aforesaid order was rendered. That on May 24, 1938, the petitioner received a copy of a "Rule to show cause" issued by the defendant ordering him to appear before it on the following June 9th to show why the three above mentioned horses should not be cancelled from the "Registry of Colts" and the "Registry of Race Horses." That as the basis for said order it was stated that said horses had not been born in Puerto Rico, as the defendant itself had previously certified, and that the information, declarations and documents presented to the defendant by the previous owner of the three horses in regard to their origin were false and fraudulent. That after the hearing of June 9, 1938, the defendant on November 30th rendered the decision by which it ordered the definite cancelation of said horses in the Studbook, as well as in the "Registry of Race Horses,'" based on the fact that the previous owner had fraudulently obtained their inscription. That said decision of November 30th is null, void, arbitrary, confiscatory and unreasonable, and that it deprived the petitioner of his property rights in said animals without due process, for the following reasons:

"(a) Because the respondent had no jurisdiction nor authority to render said decision as it had no competent evidence before it to prove the fraud which it accepted as proven.

"(b) Because notwithstanding the fact that the law for the inscription of a horse in the studbook says that said inscription is permanent and it may be annulled only for just cause and after a hearing in which the parties have been given an opportunity to defend themselves, in this case there was no cause whatsoever and the hearing required by law was not held inasmuch as the respondent repeatedly denied the petitioner the right to defend himself even though said petitioner requested on various occasions that he be allowed to do so.

"(c) Because said decision rests on the testimony of the witnesses Federico Santiago, William W. Vaughan, Arthur Cromwell, James

H. Anderson, James Kaney, Harry Wakoff and others, and said witnesses were not present at any time during the hearing nor did they testify before the respondent, who repeatedly denied the petitioner his right to be confronted with and to cross-examine said witnesses notwithstanding the repeated requests of the petitioner."

The petitioner also alleged:

"That he bought the aforesaid race horses from the breeder of the Heirs of Nieves & Castrillón as horses bred in this country, that for this he relied on the certificates issued by the defendant which certified that said horses were bred in this country and on the records, files and books of said defendant from which it appears that an inspection of said horses was made by officials and by the official veterinary of the defendant and that said veterinary marked said horses on the neck; the petitioner also alleges that barely three months after he bought said horses, the defendant forbade him from entering them in races in any Puerto Rican race tracks, and forbade him to sell, cede or transfer said horses in any manner, that due to this the petitioner has not only been denied the right to enter them in races and win the corresponding prizes, but also of the right to dispose of his own property, and he has been obliged to feed, take care of and watch over said race horses without being able to use them in any manner whatsoever.

"That the petitioner has paid the defendant all the fees required by law for a reinspection, as well as for the inscription of said three horses in his name. That at no time before he purchased said three horses did the defendant tell him that said certificates issued by the defendant itself were null and void.

"That by law when the inscription of a horse is annulled the owner may not sell, cede or transfer it in any manner whatsoever to any person, partnership, or stable, and any other horses belonging to the same owner, or any other horses in which he may have an interest are likewise affected by said annulment, and as the petitioner is the owner of a stable of horses the aforesaid decision affects not only the horses Mae West, Joan Crawford and Myrna Loy, but also all the other races horses belonging to said stable.

"That if said order is enforced, his property rights in said horses as well as in all the other horses of the "Don Stable" will be destroyed inasmuch as said horses have no value whatsoever except as race horses, and the petitioner will be caused irreparable damages. That it is very difficult to ascertain the amount of these

damages as there is no manner of estimating the prizes that said horses could win if they took part in the races run in the Puerto Rican race tracks.

"That he has no rapid and adequate remedy at law to stop the defendant from enforcing its aforesaid order, notwithstanding the fact that said order is null and void, confiscatory and unreasonable, as there is no right of appeal from said order."

The petition for an injunction ends with the following prayer:

"For said reasons the petitioner respectfully prays this Court to issue a mandatory writ of injunction forbidding the defendant or any of its members from enforcing its order of November 30, 1938, either personally or by its agents, employees or officers or any other person, whereby it ordered the cancellation of the inscriptions of the horses Mae West, Coronela and La Gallega from the Studbook and also the cancellation of the inscription of said horses in the Registry of race horses where they are registered under the names of Mae West, Myrna Loy and Joan Crawford.

"The petitioner also prays that until the petition for a mandatory injunction is decided, this Hon. Court issue a preliminary writ of injunction embodying the same prohibitions based on the filing of a good and sufficient bond in the amount that the court may set to respond to the defendant for any damages which may be caused it by the issuance of said preliminary writ of injunction.

"The petitioner also prays that until the petition for a preliminary writ of injunction is decided this Court issue a restraining order against the defendant containing the same prohibitions above set forth conditioned on the filing by the petitioner of a good and sufficient bond in an amount to be set by this Court to respond to the defendant for any damages which may be caused it by the issuance of the aforesaid restraining order.

"And your petitioner finally prays that in deciding the petition for these writs this Hon. Court order the defendant and each of its members to pay the petitioner the costs and expenses of the present suit plus a reasonable sum for attorney's fees."

Based on the aforesaid petition the District Court of San Juan, by its Acting Judge Tomás Torres Pérez, on December 27, 1938, rendered a "Restraining Order and Rule to show Cause" and set the bond in $1,000. This order forbade the

defendant and each of its members (naming them) from personally or by their agents, employees, etc., enforcing said order, and that once the bond was filed and approved said order be served on the defendant so that it should obey it or be in contempt of court. The court also ordered that a copy of the petition and the restraining order be served on the defendant, who if it wished might appear before the court on January 9, 1939, at 9.00 a. m. to show cause, if any it should have, why the preliminary writ of injunction should not issue. Three days after the restraining order was issued, Manuel C. Rolán filed a motion in the same court requesting the court to punish the Commission and its members for contempt of court for having disobeyed said restraining order. The court immediately issued an order requiring the Commission and its members (by name) to appear before the court on January 5, 1939, at nine in the morning, to show cause, if any they had, why they should not be punished for contempt of court.

On the aforesaid date the defendants appeared and filed an "Answer to the rule to show cause" and a "Motion to deny the petition of injunction and to dismiss the restraining order for lack of jurisdiction."

It is unnecessary, for the purposes of this opinion, to note the contents of said motions, except that part of the former in which under the title "Special Defenses" the defendants alleged that the lower court had no jurisdiction to issue the restraining order, and that part of the latter in which the defendants set forth the reasons for their allegation of lack of jurisdiction to issue said restraining order.

After the hearing of the question of contempt of court the judge, Hon. Tomás Torres Pérez, gave the parties terms to file briefs and at the same time he reset the hearing of the preliminary injunction from January 9th to January 23d. The hearing on the preliminary writ was not had on January 23d, nor does it appear from the record that the contempt of court was decided. Therefore, on motion of the petitioner

the hearing on the preliminary writ was set by Acting Judge Daniel Pellón for February 24, 1939. The Racing Commission took exception alleging that the contempt of court should be decided before the hearing. The judge, Daniel Pellón, refused to reconsider the order setting the hearing of the petitioner for a preliminary injunction.

It was as a result of this denial that on February 17, 1939, the now petitioners filed a petition for a writ of prohibition in this court in which after alleging the different motions and orders hereinabove set forth, copies of which they attached to the petition marking them exhibits, and insisting on the lack of jurisdiction of the court to issue the writ of injunction requested by Rolán, they pray:

"For the reasons above set forth the petitioners pray this Hon. Court to issue a writ of prohibition against Daniel Pellón, Jr., Acting Judge of the District Court of San Juan, and against Manuel C. Rolán, the petitioner in civil case No. 30896, to cease and desist from proceeding further in said case and especially from holding the hearing of the petition for a preliminary writ of injunction set for February 24, 1939; and ordering them to appear before this Hon. Court to show cause if any they have why they should not be prohibited from further proceeding in the civil case No. 30896 until further order from this Court. Your petitioner also prays that this Hon. Court issue a writ of certiorari to review the decision of the District Court of San Juan whereby it granted the restraining order dated December 27, 1938, a copy of which is attached hereto as exhibit "B," and that after the necessary proceedings this Court annul said order."

Based on the petition for a writ of prohibition and the exhibits attached thereto this Court on February 20, 1939, ordered the issuance of the preliminary writ directed to Hon. Daniel Pellón, Jr., judge, and to Manuel C. Rolán, petitioner for a writ of injunction, to cease and desist from any proceedings in said case and especially from holding the hearing of the petition for a preliminary injunction set for February 24th, and to appear and show cause why they should not be definitely and absolutely prohibited from so doing.

After the hearing before this Court on the date set wherein both parties argued their contentions, they were given time to file briefs and the case was finally submitted on the 14th of last month.

■ It is obvious that the mere fact that a contempt of court is pending decision does not impede the court from continuing proceedings for an injunction. On the contrary, if it is first decided that the preliminary injunction does not lie, this will help in the decision of the contempt proceedings, since if the court decides that the writ of injunction was issued without jurisdiction, as is alleged by the petitioners, the restraining order would be null and void and therefore the disobedience of the null order would not constitute contempt of court, since no one is obliged to obey an order issued without jurisdiction.

In the case of Ex parte Le Hardy, 17 P.R.R. 985, 990, this Court said:

"It is true that an order of a court which is illegal because it was made without or in excess of its jurisdiction does not have to be obeyed and that disobedience thereof is not punishable as contempt, as already held by this court in certiorari proceedings in the case of Núñez v. Soto, District Judge (14 P.R.R. 190), because contempt of court consists of a wilful disobedience of a lawful order issued by a court having jurisdiction over the matter in litigation and of the parties litigant."

See also Municipal Assembly v. District Court, 36 P.R.R. 631, Reyes Delgado v. Municipal Court, 41 P.R.R. 892, and Pérez Guerra v. Matos, 48 P.R.R. ____.

■ In the sixth allegation of the petition for a writ of prohibition the petitioners set forth the reason that they have to sustain that the lower court has no jurisdiction to hear and decide the preliminary injunction. In this respect the petitioners allege that the decision of the Racing Commission of November 30, 1938, which caused the petition for injunction filed by Manuel C. Rolán in the lower court, was reached after an investigation carried out by said Commis-

sion in accordance with section 9 of the Racing Law as it was amended by Act No. 108 of May 6, 1938, and that by express provision of said law this was an administrative act of the Commission against which, according to the peti-- tioners, no appeal may be had to the courts since the law does not give any remedy against said decisions.

The said section 9 depended upon by the petitioners, as it has been amended by Act No. 108 of May 6, 1938 (Laws of that year, page 231), states:

"Section 9.—Every natural or artificial person who by any means attempts to obtain, or obtains, the *registration in any of the studbooks* of the Insular Racing Commission of an imported horse by making it appear as a native horse, shall be guilty of a misde- meanor and punished by imprisonment in jail for not less than six (6) months or by a fine of five hundred (500) dollars, or by both penalties, in the discretion of the court; *Provided, That the period of time for the presentation of the complaint shall be three (3) years from and after the date on which the Insular Racing Com- mission shall have commenced its investigation as to the origin of the horse in question.*

"*The Insular Racing Commission is hereby empowered to elimi- nate from its studbooks any horse registered in violation of the pro- visions of this Section as well as to cancel the owner's license, if any, of the person who registered such horse,* AFTER INSTITUTING THE CORRESPONDING PROCEEDINGS; *Provided, That when, in the judgment of the Insular Racing Commission, there may be reason to believe that any imported horse has been registered as a native horse in any of the studbooks of the commission, said commission may suspend the participation of said horse in the races to be held, until a final decision is made on the matter; Provided, further, That the Insular Racing Commission is authorized to disapprove any transfer in its studbooks in connection with any horse involved in any violation of this section, until a final decision shall have been made as to the origin of such horse.*"

It is true that section 9, as copied, authorizes the Insular Racing Commission to eliminate from its registries any horse that has been inscribed in violation of its orders, and that it also authorizes it to cancel the license if the person who

inscribe the horse has a license as owner; but it is no less true that the Commission may only use these powers *"after instituting the corresponding proceedings."* And which are "the corresponding proceedings"? The answer is found in section 7 of the law itself which states that for the cancellation *"of any of the licenses issued by the Insular Racing Commission, the latter shall grant the party a previous hearing and the opportunity to defend himself."* Section 28 of the rules of the Commission itself also states as follows:

"The inscription of a horse in the studbook of the Insular Racing Commission shall be considered permanent *and it may only be annulled by the Insular Racing Commission for just cause and after a hearing of the interested parties."*

We cannot agree with the petitioners that any decision of the same kind as that rendered on November 30, 1938, would be an administrative decision. A decision of a commission, no matter of what kind, rendered under the authority awarded it by the Legislative Assembly to decide in regard to the property or rights of citizens, after hearing the interested parties, is a quasi judicial decision and not an administrative decision as the petitioners allege. See *Baker* v. *Gooding County* (1914) 25 Idaho 506, 138 P. 342; *Robinson* v. *Sup. of Sacramento* (1860) 16 Cal. 208.

In the case of *City of Macon* v. *Anderson* (1923) 155 Ga. 607, 117 S. E. 753 (a writ of error, dismissed in (1925) 269 U. S. 592, 70 L. ed. 429), it was decided that a writ of prohibition would lie to keep a municipal assembly from hearing certain charges for the dismissal of a member of the board of commissioners of the aqueduct, since the function of the board in said proceedings was judicial.

See also *Beavers* v. *Armistead* (1923) 156 Ga. 833, 120 S. E. 526; *Speed* v. *Detroit,* 98 Mich. 360, 57 N. W. 406; *Glover* v. *City Council of Columbus* (1923) 132 Miss. 776, 96 So. 521, and *O'Donnell* v. *Morrissey* (1934) 151 Misc. 315, 272 N.Y. Supp. 451.

The writ of prohibition depends on whether or not the lower court has jurisdiction to hear the injunction requested by Rolán against the petitioners, and to determine this question we must turn to the petition for injunction based on which the lower court rendered the restraining order and proposed considering the issuance of the preliminary injunction. If from the allegations of the petition of injunction it appears that the court had no jurisdiction to hear the case, it is clear that the writ of prohibition would lie, but if on the contrary, from the petition of injunction it appears that the lower court has jurisdiction, or that even if it does not have that, the decision of the lower court issuing the preliminary injunction may be reviewed on appeal, in any of these two cases the writ of prohibition should be denied. Sections 664 and 666 of the Code of Civil Procedure, 1933 edition.

We know the allegations of the petition for injunction since we have copied them at the beginning of this opinion. From them it appears that the order rendered by the Commission on November 30, 1938, was based exclusively on the testimony of certain witnesses who were not present before the Commission, thereby depriving the defendant Rolán of his right to be confronted with them and to cross-examine them, and this notwithstanding the fact that he consistently alleged his right. Accepting these facts of the petition for injunction as true, since we must consider them true in order to determine the jurisdiction of the lower court to hear said case, when and at what moment did the Commission comply with the definite precept of section 7 of the Racing Law which holds that "for the cancellation of any of the licenses issued by the Insular Racing Commission, the latter shall grant the party a previous hearing and the opportunity to defend himself?" For what reason should the effects of the rules of the Racing Commission itself be suspended in prejudice of the petitioner in the injunction case which stated that the inscription of a horse in the studbook "*may only be annulled by the Insular Racing Commission for just cause and after*

*a hearing of the interested parties"?* Section 9 invoked by the Commission in empowering it to eliminate from its registries any ilegally inscribed horse and to cancel the owner's license if he has such, states that said Commission may do so *"after instituting the corresponding proceedings."* In a government such as ours, can such an arbitrary proceeding be conceived, especially when the legislature in delegating said powers to the Commission does so under the condition that it should hear the prejudiced party and give it an opportunity to defend itself? What chance to defend himself did the interested party have if he was not even permitted to confront and to cross-examine the witnesses against him?

██ The petitioners allege that the licenses or rights that Rolán has been deprived of do not constitute vested interests but mere privileges of which he may be deprived at any moment. We admit that the Legislative Assembly, from whom said privileges or licenses emanate, has the power to cancel them at any moment without the necessity of giving the interested party any hearing whatsoever; but when that legislative power is delegated in an officer, board or administrative commission, in order that such delegation be constitutional it is necessary that the legislator declare the rules and establish the legal principles by which the person in whom the power has been delegated must make use of it and thus his functions are limited to determining if from the facts investigated they justify the application of the rules or legal principles stated by the legislator. *Mutual Film Corp.* v. *Ohio Industrial Comm.,* 236 U. S. 230, 239, 59 L. ed. 552; *Thompson* v. *Smith,* 71 A.L.R. 604, 154 S. E. 579. We have seen that our Legislative Assembly in delegating to the Insular Racing Commission by the Racing Law the powers which they now invoke, imposed the rule that said licenses or privileges should not be canceled except after giving the interested party a hearing and an opportunity to defend himself. Sections 7 and 9 of the Racing Law. Therefore, in order to legitimately exercise the powers delegated in it,

the Insular Racing Commission must conform to the conditions imposed by law. If, forgetting them, it acts in excess of its powers, oppressively or arbitrarily, causing irreparable damages, even though the law is silent as to the adequate remedy, the right of injunction proceeds to restrain it within its powers. *Purnell* v. *Maysville Water Co.*, 23 A.L.R. 223, 234 S. W. 967. See also the monograph in 112 A.L.R. 965, and cases cited.

In the case of *Arana* v. *Insular Racing Commission*, 35 P.R.R. 681, 688, in interpreting similar provisions of a previous law, this court, by its Associate Justice Mr. Hutchison, said:

"We find nothing in these sections to sustain the conclusion sought to be derived therefrom. But even if they were open to the construction suggested by appellant, the Commission has no power to repeal section 12 or any other specific provision of the law which created it. The expulsion of a horse or the elimination of its name from the studbook is a cancellation to that extent of the owner's license. If an owner can be deprived of the right to race his horses, without giving him notice or granting him the opportunity of a hearing, then the statute that requires such notice and hearing as a prerequisite to the cancellation of a license would have no effect."

And recently, in the case of *Hernández* v. *Racing Commission*, 50 P.R.R. \_\_\_\_, this court, by its Associate Justice Mr. Wolf, interpreting provisions substantially the same as those of the present Racing Law, stated as follows:

"The Act governing horse racing in Puerto Rico at the time of this case was Act No. 11 of 1932, wherein the Insular Racing Commission was authorized to make certain rules and to delegate power to act thereon to a jury appointed by the Commission for the direct supervision of the races. Under the power given by this act, the Racing Commission formulated Rule 96 for juries, subdivision *h* of which reads as follows:

" '(h) Before imposing any penalty, it (the jury) shall carry out, as far as possible, an investigation of the acts complained of, taking all testimony under oath and giving the offender an opportunity to be heard in his defense.'

"We agree that it was not the intention of the framers that all the solemnities of a trial should he observed. A jury of a racing park is not qualified to carry out a complete trial. We are quite sure that a great deal less formality is required. We think it might be enough if the witnesses and the offender were summoned, sworn and examined in an informal way and the jockey given an opportunity to call other witnesses, perhaps some of the other jockeys in the race. However this may be, the plaintiff-appellee was given no opportunity to defend. *What happened to Hernández was a near approach to what happens at the end of certain criminal trials when the court asks a defendant whether he has any reason to express why sentence should not be pronounced. If an injunction lay for failure to perform the provisions of Rule 96, supra, this was a clear case falling under it.*" (Italics supplied.)

██ In regard to the sufficiency of the hearing and the opportunity for a defense, it is advisable, as it is perfectly applicable to the question now before us, to refer to the case of *Int. Com. Comm.* v. *Louisville & Nashville R. R.*, 227 U. S. 88 (57 L. ed. 431). In said case the New Orleans Board of Trade filed three separate proceedings against Louisville & Nashville R. R., requesting the Commerce Commission to annul as unjust, unreasonable and discriminatory certain tariff for rates. The railway company answered. A hearing was had, the tariff was adjusted by stipulation of the parties, and on December 31, 1909, the Commission, by a simple order in which it declared that the tariffs were unreasonable, ordered the reestablishment of the former tariffs and that the corresponding reduction in the same be made. The railway company then filed, on January 26, 1910, an appeal in equity in the Circuit Court of the United States for the Western District of Kentucky, praying that the Commission be estopped from carrying out said order which the complainant stated was arbitrary, oppressive and confiscatory, and that it deprived the company of its property and its right to impose tariffs, without due process of law. The Circuit Court refused to issue the preliminary injunction. Later the case was removed to the Commerce Court, the United States having

been made a party. In said court, besides the evidence which the Circuit Court had before it, the company presented all the evidence that had been introduced before the Commission, in order to prove that the evidence did not show in any manner that the impugned tariffs were unreasonable. In an extensive opinion of the Commerce Court (one judge dissenting) it was held that the order of the Commission was null and void because there was no evidence to uphold it. In the appeal filed to the Supreme Court of the United States the Government insisted that according to the provisions of the Hepburn Act of 1906, the tariffs may be cancelled *"if after a hearing the Commission is of the opinion that they are unreasonable."* It was insisted that the order based on such opinion was conclusive (notwithstanding the adverse decision in the case of *Com. Comm.* v. *Union Pac. R. R.,* 222 U. S. 541, 547 (56 L. Ed. 308), and that it could not be annulled even though the conclusion was not sustained by the evidence.

In deciding the question the Supreme Court said:

"But the statute gave the right to a full hearing, and that conferred the privilege of introducing testimony, and at the same time imposed the duty of deciding *in accordance with the facts proved.* A finding without evidence is arbitrary and baseless. And if the Government's contention is correct, it would mean that the Commission had a power possessed by no other officer, administrative body, or tribunal under our Government. It would mean that where rights depended upon facts, the Commission could disregard all rules of evidence, and capriciously make findings by administrative fiat. Such authority, however beneficently exercised in one case, could be injuriously exerted in another; is inconsistent with rational justice, and comes under the Constitution's condemnation of all arbitrary exercise of power.

"In the comparatively few cases in which such questions have arisen it has been distinctly recognized that administrative orders, quasi-judicial in character, are void if a hearing was denied; if that granted was inadequate or manifestly unfair; if the finding was contrary to the 'indisputable character of the evidence.'" (Citations.)

Finally the Supreme Court reversed the judgment of the Commerce Court not because the Commission had the arbitrary powers which it alleged, but because in considering the case it reached the conclusion that the Commission in restoring the previous tariffs had not acted arbitrarily but based on substantial evidence, even though contradictory, and this being so the conclusion of facts to which the Commission arrived in deciding the conflict of the evidence, since the courts should not substitute their opinion for that of the commissions empowered to establish tariffs, whenever their decisions are sustained by substantial evidence, was upheld.

There is no doubt, therefore, that the allegations of the petition for injunction presented in the lower court constitute sufficient facts to state a cause of action and that the District Court has jurisdiction to hear the case. This being so, the writ of prohibition requested by the petitioners does not lie since besides there being jurisdiction in the lower court the preliminary injunction which might have been issued if such jurisdiction did not exist would be appealable and, therefore, section 666 of the Code of Civil Procedure (1933 ed.) would be applicable in its provision that no writ of prohibition will lie to prohibit the lower courts from deciding any question which may be reviewed by appeal.

For the foregoing reasons the writ issued should be annulled so that the proceedings may continue in the lower court.

***

ON MOTION FOR RECONSIDERATION

May 10, 1939

In this case the plaintiff filed a long motion requesting that we reconsider our judgment of the 12th of last month, by which we denied the writ of prohibition sought by her. The opinion sustaining our judgment is based principally in that in accordance with the facts alleged in the petition for injunction which gave rise to the petition for the writ of prohibition, the Insular Racing Commission acted arbi-

trarily and gave no opportunity for defense to the party aggrieved Manuel C. Rolán, when it approved its resolution of November 30, 1938. We have studied the plaintiff's motion and far from inclining to rectify, we reaffirm ourselves in the position we assumed in the judgment whose reconsideration is sought.

The plaintiff, in trying to distinguish the case of *Interstate Commerce Commission* v. *Louisville & Nashville R. R. Co.*, 227 U. S. 88, extensively referred to in our opinion, quotes a few paragraphs from the case of *Steamboat Canal Co.* v. *Garson*, 185 Pac. 801, 804, 805, decided by the Supreme Court of Nevada. From the paragraphs quoted by the plaintiff herself it clearly appears that said Nevada case decisively upholds our opinion. After a brief summary of the case of *Louisville & Nashville R. R. Co.*, supra, it is said in a paragraph quoted by the plaintiff from the opinion of the Nevada case:

"In the instant case the order of the commission was not without substantial evidence to support it, nor did the commission base its order upon *extraneous evidence*, as was asserted to be the power of such administrative boards in *Interstate Commerce Commission* v. *Louisville & Nashville Railroad Co.*, supra. As previously stated, a full hearing was held, at which all parties were represented, and cognizant of the evidence submitted, and given every reasonable opportunity to introduce witnesses, *to cross-examine*, to test, explain, or refute any evidence to be considered by the commission." (Motion for reconsideration of the plaintiff, page 32.) (Our Italics.)

Such was not the kind of hearing had in the case at bar. Rolán had no opportunity to cross-examine the witnesses against him, who were not even present at the so-called hearing, but they testified by means of ex parte affidavits. If from the petition for the injunction it had appeared that the Insular Racing Commission granted Rolán as extensive a hearing as that which took place in the Nevada case relied upon by her, and if it had further appeared that the evidence tended to sustain the resolution now attacked, our judgment would certainly have been different.

The plaintiff also cites the case of *Traer* v. *State Board of Medical Examiners,* 76 N. Y. 833, which involved the cancelation of a license granted to a doctor to practice his profession. The Board of Medical Examiners notified Dr. Traer of the charges filed against him, and that he should appear and defend .himself. Traer appeared by counsel at the first hearing and requested a continuance, which was granted. He did not appear at the second hearing. The Board, basing its decision on certain copies of sworn declarations attached to the complaint filed by five physicians of the county against Dr. Traer, canceled his license. Dr. Traer did not accept this decision appealed to the courts, and the Supreme Court of Idaho, sustaining the resolution of the Board of Examiners, said among other things:

" . . . We do not overlook the fact that the originals would not have been evidence in a court of law, which could not have been introduced over the objection of the plaintiff; but they constituted evidence competent for some purposes, and tended to show that the certicate of the plaintiff should be revoked. *Although, in law, he had the opportunity to object to their use, he did not do so.* The board did not act without evidence, but, taking the view most favorable to the plaintiff, *acted upon evidence which should have been excluded had objections been duly made."* (Motion for reconsideration of the plaintiff, pages 25–26.) Italics supplied.

As it appears from the petition for injunction, in the instant case Rolán repeatedly objected and never waived his right to prevent that the affidavits be admitted in evidence. Despite his objections the Insular Racing Commission admitted them. Had the Commission followed the rule set by the Supreme Court of Idaho in the case cited by it, it would not have admitted said statements, and if they had not been admitted there would have been no evidence at all against him, and consequently it would not have rendered the decision which it arbitrarily rendered.

For the reasons stated the reconsideration asked for is denied.